DELL, Judge.
Appellants seek reversal of two orders issued in an administrative proceeding conducted pursuant to the Florida Electrical Power Plant Siting Act, §§ 403.501-517, Florida Statutes (1985). The Governor and his Cabinet, sitting as the Siting Board, issued the two final orders. Appellants filed separate appeals that we have consolidated for review.
These appeals concern the construction and operation of a resource recovery facility (RRF) at a location near the city limits of Riviera Beach and the neighborhoods and homes of some of the appellants. The selection of the site for the RRF is the primary responsibility of the Solid Waste Authority. Since the RRF will generate electrical power for public consumption the permitting for the RRF is controlled by the Florida Electrical Power Plant Siting Act, Section 403.501-517, Florida Statutes (1985). The Electrical Power Plant Siting Act requires two hearings before a hearing officer from the Florida Department of Administrative Hearings. The first hearing determines the consistency of the proposed *1338 land use with existing land use plans and zoning ordinances and the second hearing determines the need for the facility balanced against the environmental impact of its construction and operation. The hearing officer is charged with the responsibility of making findings of fact and recommended orders to the siting board. The siting board, made up of the governor and the cabinet, has final decision making authority concerning the approval or disapproval of the proposed facility.
The hearing officer found that initially the planned RRF will dispose of two thousand tons of refuse daily and generate fifty megawatts of electrical power. Ultimately it will dispose of three thousand tons of refuse and generate seventy-five megawatts of electrical power. It will include a building complex, a refuse derived fuel production plant, combustion and electrical power production facilities, and landfill areas. The site will include access roads, a conservation area, and buffer service roads and ditches.
Appellants claim that the site of the planned RRF is not consistent with the Palm Beach County Comprehensive Land Use Plan or with the county zoning ordinances. They also claim that the record does not contain substantial competent evidence that this is the best site for the facility in Palm Beach County. Wé affirm.
Appellants make three arguments in support of their contention that the proposed site is not consistent with the Palm Beach County Comprehensive Land Use Plan and zoning ordinances. They contend that the referee erroneously focused his attention on one sentence in the comprehensive plan which allows public utilities to be located anywhere in Palm Beach County; that the referee preempted the comprehensive land use policies and map designations by relying upon the wording in the zoning ordinance allowing sanitary landfills and incinerators in agricultural residential districts subject to commission approval of special exception; and that the referee erroneously ignored the comprehensive plan by finding the facility to be consistent as a public utility. The Palm Beach County Comprehensive Plan provides:
GENERAL COMMERCIAL AND INDUSTRIAL REFERENCE AREAS AND SPECIAL LAND USE POLICIES AND REGULATIONS
As indicated above, all commercial areas and many industrial areas may be located only in areas delineated in the test [sic] of the Plan. These commercial and industrial permitted areas are defined below.
In addition, there are special land use and density restrictions within some of the land use areas on the Land Use Plan Map. These special restrictions and considerations are also specified in the following text.
In order to simplify finding specific locations of commercial, industrial or special land use policies and regulations, the map of the County and the text are divided into twenty-six (26) reference areas. These have no significance except as locational guides, and the numbers on the Map Areas correspond to the Area Numbers in the test.
General Policies. Although there are areas delineated within Palm Beach County for permitting commercial and industrial uses, and in which special policies or regulations apply, there are certain uses and policies which are areawide in nature and are applicable throughout the County or specific areas of the County. These general policies are as follows:
1. Commercial uses may be allowed anywhere within Palm Beach County as a part of an approved PUD.
2. Public/semipublic buildings may be permitted anywhere within Palm Beach County, provided that they are located in a proper zoning district.
3. Public utilities may be located anywhere within Palm Beach County subject to restrictions of the Zoning Ordinance.
[Emphasis supplied.]
Appellees point out that although the comprehensive plan does not define a utility, the zoning code includes refuse and trash dumps and sanitary landfill within its special exception for public and private utility services:
*1339 PUBLIC AND PRIVATE UTILITY SERVICES and accessory buildings and structures including but not limited to the following:
Electric power and light substation Gas and water regulation station Incinerator

Refuse and trash dumps (See Section 500.5)

Sanitary land fill (See Section 500.5) Sewage Treatment Plant Telephone exchange building and substation
Water tower, storage tank, reservoir, treatment plant
Transfer station (See Section 500.4).
[Emphasis added.]
Section 500.5 of the Zoning Code expressly governs resource recovery facilities and provides as follows:
500.5 SANITARY LAND FILLS, VOLUME REDUCTION PLANTS AND RESOURCE RECOVERY FACILITIES
In addition to the requirements of Sections 401.1A. and B., the following information, requirements and regulations shall be met for all Resource and Recovery Management Facilities.
A. PURPOSE AND SCOPE.
These regulations concerning the disposal of solid waste are intended to reduce air, noise and water pollution, and the use of the land as an uncontrolled receptacle for improperly treated wastes. The regulations are intended to require solid waste disposal in a manner which protects the public health, safety and welfare, to enhance the environment, and to recover resources which have the potential of further use.
It is the purpose of this section to permit only those land utilizations which are consistent with the Countywide Solid Waste Management Plan.
B. APPLICATION.
Any person, firm, agency, association, corporation or authority desiring to operate a sanitary land fill, volume reduction plant and/or resource recovery facility shall meet the requirements of Part IV, Resource Recovery and Management, of Chapter 403, Florida Statutes.
At the land use hearing, the parties presented lay-witness testimony and numerous exhibits, including maps, charts, and diagrams, pertaining to the project. Experts testified in the fields of land-use planning and zoning, electrical engineering, landscape architecture and planning, acoustical engineering, traffic engineering, and real estate appraisal. Section 120.68(10) provides:
If the agency’s action depends on any fact found by the agency in a proceeding meeting the requirements of s. 120.57, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency’s action depends on any finding of fact that is not supported by competent substantial evidence in the record.
Our review of the record satisfies us that it contains competent substantial evidence to support each of the hearing officer’s findings of fact. We find no error in his amended order in which he concludes that the site of the RRF falls within the definition of a utility and that it is consistent and in compliance with the existing land use plans and zoning ordinances. See Section 403.508(2), Florida Statutes (1985).
Appellants next argue that adverse environmental impacts will occur from the operation of the RRF and that the record does not contain substantial competent evidence that the site is the best site for the facility in Palm Beach County. The legislative intent of the Electrical Power Plant Siting Act is expressly stated in section 403.502:
The legislature finds that the present and predicted growth in electric power demands in this state requires the development of a procedure for the selection and utilization of sites for electrical generating facilities and the identification of a state position with respect to each proposed site. The legislature recognizes that the selection of sites and the routing of associated transmission lines will have *1340 a significant impact upon the welfare of the population, the location and growth of industry, and the use of the natural resources of the state. The legislature finds that the efficiency of the permit application and review process at both the state and local level would be improved with the implementation of a process whereby a permit application would be centrally coordinated and all permit decisions could be reviewed on the basis of standards and recommendations of the deciding agencies. It is the policy of this state that, while recognizing the pressing need for increased power generation facilities, the state shall ensure through available and reasonable methods that the location and operation of electrical power plants will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life. It is the intent to seek courses of action that will fully balance the increasing demands for electrical power plant location and operation with the broad interests of the public. Such action will be based on these premises:
(1)To assure the citizens of Florida that operation safeguards are technically sufficient for their welfare and protection.
(2) To effect a reasonable balance between the need for the facility and the environmental impact resulting from construction and operation of the facility, including air and water quality, fish and wildlife, and the water resources and other natural resources of the state.
(3) To provide abundant, low-cost electrical energy.
At the certification hearing, experts testified concerning the environmental impact of the RRF.[1] The hearing officer gave the parties a full opportunity to be heard and to present extensive evidence concerning the proposed resource recovery facility. The record contains overwhelming evidence in support of the hearing officer’s findings including but not limited to the site, impact on wetlands and wildlife, impact on water resources, air quality impact analysis, and the impact on human health and the environment. The record also demonstrates that the Solid Waste Authority has taken extreme precautions to protect the environment.[2]
Appellant has failed to demonstrate that the siting board erred when it adopted the hearing officer’s findings of fact and con- *1341 elusions of law concerning the consistency of the land use with the Palm Beach County Comprehensive Plan and existing zoning and when it certified the site for construction of the resource recovery facility.
AFFIRMED.
WALDEN and GUNTHER, JJ., concur.

. Appellees presented expert testimony in the fields of design of resource recovery facilities, emphasis on combustion; meteorology and air dispersion modeling; epidemiology and health risk assessments; toxicology; mechanical engineering; environmental engineering, emphasis on landfill design; geosynthetic design of landfills; hydrogeology, emphasis on injection wells, water resource development, ground-water management, groundwater contamination, and aquifer exploration; chemistry, emphasis on water and soil chemistry; biology, emphasis on ecology; environmental air pollution control and air control technology. Appellants presented expert testimony in the fields of chemical engineering; toxic effects of chlorinated organic compounds on the reproductive systems of animals and humans; biochemistry and geochemistry; surface and ground water hydrology and modeling; biology and biochemistry, emphasis on dioxins and risk assessment associated with municipal waste incinerators.

. This is highlighted in the following brief summary taken from appellees’ brief, concerning the protections of ground water that will be made:
The groundwater protection system will collect any leachate (contaminated water) from the landfill which will then be processed through an equalization basin, a pumping station, and deep well injected. The proposed leachate collection system which will underlie the landfill is as follows: ash residue; 24 inches of sand which will filter and trap leachate as well as cushion the liner below; a geotextilefilter; a geonet; a high density polyethylene geomembrane; another 12 inches of sand; another geotextile filter; another geo-net; another high density polyethylene geo-membrane; then 6 inches of recompacted select fill. The proposed liners are nearly impermeable with a permeability factor of 10 E-12 CM/S; thus although technically it is permeable and technically it leaks, it would require thousands of years for a drop of water to penetrate this system. Substantial competent evidence shows that nothing to be expected in municipal waste leachate or in leachate from a resource recovery facility will harm the proposed geosynthetics. This leachate collection system exceeds DER standards and is in fact the design required by the EPA for *1341 hazardous waste landfills. Expert testimony shows that no measurable leakage is expected from this landfill through this liner system into the environment.